Johnny SMITH, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

James A. CHRANS, as Warden of Pontiac Correctional Center, Defendant,

American Federation of State, County, and Municipal Employees, AFL–CIO, Intervenor-Defendant.

Nos. 79–2054, 81–2078.

United States District Court, C.D. Illinois, Danville Division.

March 3, 1986.

---

Ben Wolfe, Roger Baldwin Foundation of ACLU, Inc., Chicago, Ill., for plaintiffs.

Ed King, Bart Murphy, Asst. Ill. Attys. Gen., Gilbert Feldman, AFL–CIO, Chicago, Ill., for defendant.

### FINAL ORDER

BAKER, Chief Judge.

#### I.

This is a class action by all prisoners at the Pontiac Correctional Center of the Illinois Department of Corrections seeking declarative and injunctive relief to remedy what the prisoners assert are violations of their residual constitutional rights to privacy. Jurisdiction is granted to the court under 28 U.S.C. § 1343(a)(3). Relief is sought under 42 U.S.C. § 1983 by claiming that the defendant, acting under color of state law, has deprived the plaintiffs of their rights under the First, Third, Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments and the penumbra of the Bill of Rights.

Specifically, the plaintiffs say that they are subjected to view by women employees of the Department while the inmates are in their cells or open shower and toilet facilities engaged in basic bodily functions. The plaintiffs also complain that tours of visiting students and law enforcement cadets, some of whom are women, are allowed to see the plaintiffs unclothed or engaged in basic bodily functions.

The defendant, James A. Chrans, is sued in his capacity as Warden of Pontiac Correctional Center. In defense of the claim, Chrans says (1) the plaintiffs have no constitutional right of privacy which is infringed by females viewing them undressed and using the toilet; (2) any privacy rights the plaintiffs might have are reasonably accommodated by current policies at the Pontiac Correction Center; and (3) the state has an obligation to afford female correctional employees equal employment oppor-

608

tunities and not to discriminate against them because of their gender. The defendant, American Federation of State, County, and Municipal Employees (AFSCME), as collective bargaining agent of the female corrections officers at Pontiac, has intervened in their behalf.

At the close of the plaintiffs' evidence, the defendant moved pursuant to Fed.R. Civ.P. 41(b) for dismissal on the ground that upon the facts and the law the plaintiffs have shown no right to relief. For the reasons stated in this order the motion is allowed.

II.

Based upon the record and the evidence adduced, the court finds the following facts. The Pontiac Correctional Center is a maximum security penitentiary for male inmates operated by the Illinois Department of Corrections. The institution houses approximately 2,000 prisoners and has a staff of 740 employees. Of the 740 employees, about 100 are women and of that number, approximately 28 are corrections officers. The bulk of the female employees at Pontiac are social workers and counsellors, dietary personnel, medical staff, storekeepers, teachers, and secretaries.

There are three cellhouses at Pontiac. Each cellhouse contains eight to ten galleries, each of which has approximately 52 cells. Double celling of inmates predominates. The typical cell is a cubicle with three walls and an open front end covered by bars. The barred end of the cell opens onto the gallery which runs the length of the tier of cells. Anyone walking on the gallery can see into the cells and observe the activities of the inmates in the cells.

Each cell contains two beds, a sink, and a toilet. The cell also contains all the personal belongings of the inmates and sometimes a chest of drawers. In some of the cells, the toilet is located at the rear of the cell. In other cells the toilet is located at the gallery end of the cell.

Female employees of the Department come upon the gallery unannounced. The corrections officers patrol the gallery. The social workers and counsellors come upon the gallery to see inmates. Storekeepers distribute commissary goods. Female medical personnel come upon the gallery to take sick call. Department lawyers interview inmates. In addition, upon occasion, tours of students, public officials, state police cadets, and corrections officers cadets, including females, are conducted unannounced in the cellhouse galleries.

Female corrections officers began to serve at Pontiac in about November, 1975. On February 15, 1984, the Department of Corrections reached an agreement with the intervenor, AFSCME. That agreement provides in pertinent part that "no employee shall be ineligible to be assigned to a post based on gender except for visitor shakedown." The agreement also provides that:

"Certain duties ... may be limited based on gender. 1) Direct supervision of open showers; 2) direct supervision of open toilets other than cells; and 3) strip shakedown."

The official policy of the Department of Corrections is to hire and assign female corrections officers and other personnel to all duties on the same basis as male corrections officers with the exception of assignments identified in the agreement of February 15, 1984. At present there are no full time duty assignments for female corrections officers on the cell house galleries. Female employees generally are not in the area of the open toilets and showers in the industrial section of the prison and the showers in the cellhouses are not open areas but closed areas that can be locked off for security purposes. "D" dormitory in the Pontiac Medium Security Unit, "the farm," has open showers and toilets.

On May 3, 1984, by a bulletin issued at Pontiac, the defendant authorized inmates to cover the lower portion of the front of their cells up to the fourth bar. The bulletin also allowed inmates a "small privacy curtain, not to exceed 30″ in width and no higher than the authorized cell curtain, in front of the toilet area."

In a bulletin dated March 25, 1985, the Warden rescinded all former policies on cell curtains. The order of March 25, 1985, provided that "no cell coverings will be allowed in front of the cells," and went on further to provide:

Inmates will be allowed a small privacy curtain, not to exceed 30″ in width, in front of the toilet area. Curtains hanging around the edges of the bed, ends of the beds, or between the cell door and the beds, will not be permitted. No covering will be permitted that obstructs the view from outside the cell to the rear of the cell. The privacy curtain will provide a certain amount of privacy in the cell, while still allowing for proper air circulation and observation of the cell area in order to prevent possible miscounts or illegal activities.

The plaintiff, Johnny Smith, related specific instances on which he has been observed by female employees and visitors at Pontiac. The court finds the incidents are typical of incidents which the entire class of plaintiffs would have experienced and credits Smith's testimony as true. (1) Smith describes an incident in 1981 when a female counsellor came to his cell and asked to have a paper signed while Smith was wearing his underwear. (2) He recounts an incident in January, 1981, when he was being strip searched in the shakedown room in the armory. When Smith had his underwear halfway off, a woman corrections officer looked through the window of the room and Smith quickly pulled his underwear back up. (3) He says the same sort of occurrence took place in March or April of 1981. (4) Smith says that in 1979 some female corrections officers were assigned to escort inmates to the shower. The inmates did wear towels or some other clothing while they were walking to the shower. (5) Smith tells of similar occurrences in the shower area for the North Protective Custody Unit in 1981 and 1982. The women corrections officers stood outside the shower area and waited for the inmates to come out and, on occasion, one of the female corrections officers would look through the window of the shower room door. (6) Smith also tells of two incidents, one in January, 1981, and one in March, 1981, when a female corrections officer came to his cell while he was sitting on the toilet and told him he had a visitor. On one of those occasions, when Smith objected to the woman's presence, she replied that she was a corrections officer and had a right to stand there and see Smith in that condition. (7) Smith says that until December, 1985, the female members of the institution grievance committee used to come on the gallery and transact business with the inmates in their cells. (8) Smith also says that female attorneys from the Department of Corrections come upon the galleries unannounced to interview inmates. (9) Smith complains that tours come several times a month to walk down the gallery, and (10) Smith says that when the state police cadets came through on tour, the corrections officers on duty required the inmates to take down all privacy screens before the tour arrived. (11) On one occasion in the fall of 1980 when a tour group including females came through, Smith was in the shower and he was told by the corrections officer on duty to hurry and get out of the shower and go back to his cell. Before Smith could get to his cell, the tour began to walk down the gallery. Smith said that on each of the occasions he described, he felt humiliated, degraded, and dehumanized.

The plaintiffs also called three expert witnesses: Gordon Kamka, former Secretary, Maryland Department of Public Safety and Correctional Services, Jeanette Musengo, Director, John Howard Association, Illinois Jail Project, and Dr. Frank Rundle, psychiatrist and former Director Prison Health Services of New York City, who by their experience and education have special knowledge and insight into the operation of correctional institutions. They observed the obvious and gave their opinions that requiring inmates to live in open-ended unscreened cells like those at Pontiac deprives the inmates of privacy and engenders feelings of humiliation and resentment. The three witnesses also were of the opinion

that the stated goal of the defendant Warden to remove all privacy screens from the cells was bad correctional policy.

### III. CONCLUSIONS OF LAW

#### A.

The case or controversy presented to the court is this: does a male penitentiary inmate have a constitutionally protected right not to be seen by female institution employees, students, and law enforcement personnel while the inmate is in his cell or open shower or toilet facilities, undressed or engaged in basic bodily functions?

The positions of the adversary parties are polarized. The plaintiffs contend that they have residual rights of privacy founded in virtually the entire Bill of Rights and in the shadow cast by that document. The defendant, on the other hand, takes the position that a penitentiary inmate has absolutely no rights of privacy whatsoever. Neither extreme seems tenable.[1] *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), upon which the defendant relies, held that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Id.* at ——, 104 S.Ct. at 3199–3200.

■■■ The court accepts the reality that "[l]oss of freedom of choice and privacy are inherent incidents of confinement," *Bell v. Wolfish*, 441 U.S. 520, 537, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979), and recognizes that *Hudson* leaves an inmate no rights of privacy in the papers and effects in his cell. Nonetheless, to say that an inmate's loss of privacy in his effects extends to his person and that he no longer possesses any residu-

um of personal privacy whatsoever, is an unwarranted extension of *Hudson*. *Hudson* does not hold that a prisoner lacks any expectation of privacy in his person which is protected by the Fourth Amendment. Needs for institutional security and the right of institution administrators to search inmates may limit a prisoner's expectation of privacy, *Bell v. Wolfish, supra*, but some shred of personal body integrity must remain. Certainly a prisoner cannot be subjected to maliciously motivated searches of his person or intentional harrassment. *Hudson v. Palmer*, 468 U.S. at ——, 104 S.Ct. at 3201–3202. Therefore, the court rejects the defendant's argument that a prisoner has no rights of personal privacy whatsoever.

The plaintiffs' assertion that prisoners have rights of privacy derived from the First Amendment and the penumbra of the Bill of Rights, on the other hand, is equally untenable.[2] The plaintiffs rely on *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1964) and on *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1972). Neither of those cases is apposite to the situation presented here. The precious rights articulated in *Griswold* and *Roe v. Wade* are rights of association and personal autonomy possessed by people living in a free society which a penitentiary inmate has forfeited by his conviction and incarceration. That is made evident by the Court's discussion in *Griswold* of the Fourth and Fifth Amendments' protection against invasions of the privacies of life. The Court quoting from *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1885), says that a citizen's right to privacy rests upon freedom from "the invasion of his indefeasible right of personal security, personal liberty, and private property, *where that right has never been forfeited by his conviction of some*

---

1. The court is concerned only with whether a constitutional infringement is shown by the evidence and not with whether the Illinois Department of Corrections is following rational or desirable correctional policies. Much of the plaintiffs' evidence seemed to be directed toward the latter point.

2. In oral argument the plaintiffs abandoned their claim right under the Third Amendment.

*public offense,....*" 381 U.S. at 484 n. *, 85 S.Ct. at 1681 n. * (emphasis added). These cases suggest that the very fact of the plaintiffs' incarceration limits the constitutional sources from which a right of privacy might derive.

In *Shabazz v. O'Lone,* 782 F.2d 416 (3d Cir., 1985) (en banc), the Third Circuit recently considered the relationship between the constitutional rights of inmates and the security concerns of prison officials. Recognizing that "[i]mprisonment necessarily places limits upon many of the constitutional freedoms enjoyed by free citizens," the *Shabazz* court nonetheless noted that prison inmates retain some constitutional rights. The court said that "inmates retain those constitutional rights that are not inconsistent with their status as prisoners or with the legitimate penological goals of the corrections system." *Id.,* at 418–19 (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537–38, 53 L.Ed.2d 629 (1977); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)).

■ The plaintiffs' residual right of personal privacy, restricted and limited as it is, must arise under the language of the Fourth and Eighth Amendments and not from the penumbra of rights associated with the Bill of Rights in general. The court perceives the residuum of personal privacy possessed by penitentiary inmates as twofold: The plaintiffs retain Fourth Amendment protection from invasions of bodily privacy not related to institutional security, and Eighth Amendment protection from searches which are maliciously motivated and intended as harrassment and punishment.

#### B.

■ The evidence adduced by the plaintiffs shows that the sightings of the plaintiffs in conditions of undress and performing toilet functions were occasional and almost inadvertent. The occasions outlined by the plaintiff, Johnny Smith, extended over a period of six years between 1979 and 1985. Nothing in the evidence indicates malicious motivations for the sightings, the deliberate harrassment of the plaintiffs by the defendant, or the deliberate or intentional infliction of humiliation and degradation.

The Warden articulates legitimate security reasons for refusing to allow the plaintiffs to have cell curtains. For example, cell curtains can hide sexual assault and the possession of contraband. The loss of privacy by the plaintiffs, therefore, is directly related to institutional security. The court concludes there is nothing in the evidence that shows an infringement of the residual rights of the plaintiffs under either the Fourth or the Eighth Amendments.

The plaintiffs emphasize that Warden Chrans' personal opinion is that an inmate has no remaining right of privacy. The plaintiffs fear that Warden Chrans may embark upon a policy of further restrictions on the residuum of privacy remaining to the plaintiffs. Obviously, the court cannot deal with hypothetical or anticipated issues. The current policy at Pontiac as evidenced by the agreement with AFSCME is not to employ female corrections officers in monitoring open showers or toilets or in performing strip searches. At present there are no full time duty assignments for female corrections officers on the cell galleries.

Whether Warden Chrans will carry out his declared intent is pure speculation. Pontiac has had three wardens in the past seven years and the policies of each has been different. The court commends certain observations of the dissent in *Hudson v. Palmer* to Warden Chrans for his consideration:

> Depriving inmates of any residuum of privacy or possessory rights is in fact plainly *contrary* to institutional goals. Sociologists recognize that prisoners deprived of any sense of individuality devalue themselves and others and therefore are more prone to violence toward themselves or others. At the same time, such an approach undermines the rehabilitative function of the institution. "With-

out the privacy and dignity provided by fourth amendment coverage, an inmate's opportunity to reform, small as it may be, will further be diminished. It is anomalous to provide a prisoner with rehabilitative programs and services in an effort to build self-respect while simultaneously subjecting him to unjustified and degrading searches and seizures." Gianelli & Gilligan, Prison Searches and Seizures: "Locking" the Fourth Amendment Out of Correctional Facilities, 62 Va.L.Rev. 1045, 1069 (1976).

468 U.S. at ——, 104 S.Ct. at 3213–3214. (Stevens, J., dissenting)

The Warden might also bear in mind the observations of the court in *Smith v. Fairman,* 678 F.2d 52 (7th Cir.1982):

> For our present purposes we will assume that having to endure what is commonly referred to as a frisk or pat-down search could to some persons be a humiliating and degrading experience. Even so limited a search as this "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be taken lightly." *Terry v. Ohio,* 392 U.S. 1, 13, 17, 88 S.Ct. 1868, 1875, 1877, 20 L.Ed.2d 889 (1968). To require one not only to submit to such a search, but to have it performed by a member of the opposite sex could well, for many people, only add to the feeling of degradation. *United States ex rel. Wolfish v. Levi,* 439 F.Supp. 114, 159 (S.D.N.Y.1977), *aff'd* 573 F.2d 118 (2nd Cir.1978), *rev'd on other grounds sub nom. Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 1865, 60 L.Ed.2d 447 (1979). Rational prison management should recognize this basic fact of human behavior and, where possible, respond accordingly.

*Id.* at 53.

The analysis of the court in *Smith v. Fairman,* 678 F.2d 52 (7th Cir.1982), suggests the appropriate result in this case. The intrusion into the plaintiffs' personal privacy is certainly unwanted, but their rights are necessarily limited as a result of their incarceration. The inadvertent and occasional sightings reported and the current policies and practices of the defendant do not rise to the level of constitutional infringements. Rather, the policy as represented in the agreement with AFSCME seems to hold to a minimum unwanted intrusions by persons of the opposite sex and, in addition, avoids discrimination against women in job opportunities because of their gender. *See also Grummett v. Rushen,* 779 F.2d 491 (9th Cir.1985).

For the foregoing reasons the defendants' motion to dismiss pursuant to Fed.R. Civ.P. 41(b) is allowed. The Clerk is directed to enter judgment in favor of the defendants and each of them and against the plaintiffs. Each party shall bear its own costs.