**Carl L. JOHNSON and Walter Story, Plaintiffs,**

**v.**

**PA. BUREAU OF CORRECTIONS: Commissioner, Ronald Marks, Super., SCIP, George Petsock, et al., Defendants.**

**Civ. A. No. 83-176.**

United States District Court, W.D. Pennsylvania.

May 28, 1987.

Kenneth J. Benson, Deputy Atty. Gen., Pittsburgh, Pa.

OPINION

COHILL, Chief Judge.

Plaintiff, Carl L. Johnson, is an inmate of the State Correctional Institution at Pittsburgh ("SCIP"), otherwise known as Western Penitentiary. Plaintiff, Walter Story, is a former inmate of the SCIP. He is presently serving his sentence at a halfway house but was at the SCIP from approximately June, 1979 through October, 1986, during which time he joined this action as a plaintiff. The original complaint in this action was filed on January 26, 1983, by Hiram R. Johnston, Jr., another former inmate of the SCIP. By his *pro se* complaint, Mr. Johnston sought relief under 42 U.S.C. § 1983 for alleged violations of his fourth amendment right of privacy and his first amendment right to freedom of religious expression. These violations were alleged to have resulted from the SCIP's assignment of female correctional officers to various areas in the jail where these officers could view Mr. Johnston when he was unclothed. Mr. Johnston requested declaratory and injunctive relief and compensatory and punitive damages for mental and emotional distress. Named as defendants were the Pennsylvania Bureau of Corrections, Ronald Marks, Commissioner of Corrections for the Commonwealth of Pennsylvania and George Petsock, Superintendent of the SCIP.

On February 16 and May 5, 1983, respectively, Carl Johnson and Walter Story filed motions for leave to join this action as plaintiffs and to file amended complaints. Both motions were granted. Each of the new plaintiffs generally made the same allegations as did Mr. Johnston, requested the same relief and damages and demanded a jury trial. On October 19, 1984, Mr. Johnston was dismissed from this action after his *"forma pauperis"* status was revoked, and he subsequently failed to reimburse the Court for costs previously unpaid.

This Court has jurisdiction pursuant to 28 U.S.C. § 1343, granting jurisdiction in civil rights cases to the United States district courts; 28 U.S.C. § 2201, providing for declaratory judgments; and 28 U.S.C. § 2202, allowing further relief based on a declaratory judgment.

On February 23, 1987, a nonjury trial began before this Court to hear testimony and receive evidence regarding plaintiffs' complaints and allegations. Further testimony was given on March 2, 1987 and final testimony and arguments were heard on March 3, 1987. At the conclusion of plaintiffs' case and again at the close of defendants' case, the defendants moved this Court to (i) dismiss the above-captioned action under the theory of sovereign immunity, or (ii) grant their motion for directed verdict. Both motions were taken under advisement at the close of the case.

We will deny defendants' motion to dismiss. We do find, however, after having heard evidence and testimony presented by both sides to this controversy that insufficient evidence exists from which a jury could reasonably find for the plaintiffs. We will accordingly grant defendants' motion for a directed verdict and direct that a verdict be entered in favor of defendants and against plaintiffs.

*Standard of Analysis*

We note initially that some dispute arose at the onset of the trial in this action concerning whether a jury should have been impaneled to hear the evidence presented. Both of the existing plaintiffs had made somewhat nebulous jury demands in their motions for leave to join this action and file amended complaints. We denied these demands because we perceived this action to

be essentially equitable in nature and therefore not entitled to a jury trial.

■ In retrospect we acknowledge that we may have erred in making this decision. *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 478 F.Supp. 889, 934 (E.D.Pa.1979) ("[T]he right to jury trial on ... legal claims may not be compromised by characterizing the case as 'basically equitable,' [or] by characterizing the legal claims as 'identical' to the equitable ones...."). We believe any such error to be harmless, however, in view of our finding that defendants' motion for directed verdict should be granted. In granting this motion, we essentially conclude that insufficient evidence exists for a jury to find in favor of plaintiffs. As a result, even if a jury had been impaneled, it never would have been called upon to perform its function. *See Laskaris v. Thornburgh*, 733 F.2d 260, 264 (3d Cir.1984) ("Error in striking the demand for a jury trial is harmless if a directed verdict for the defendant would have been warranted."), *cert. denied*, 469 U.S. 886, 105 S.Ct. 260, 83 L.Ed.2d 196 (1984).

■ In this regard, we further note that defendants' motion for directed verdict would normally be construed as a motion for involuntary dismissal under Fed.R. Civ.P. 41(b), as the motion for directed verdict applies to jury trials; and the motion for involuntary dismissal, nonjury trials. However, in view of our possible error in trying this case without a jury, we will apply the stricter standards governing a motion for directed verdict under Fed.R. Civ.P. 50(a). Even under this latter standard, though, defendants are entitled to judgment in their favor.

■ In considering whether a directed verdict should be granted in favor of defendants, we must view the evidence in the light most favorable to the plaintiffs, give the plaintiffs the advantage of every fair and reasonable inference, and then determine whether there is insufficient evidence from which a jury could reasonably find for plaintiffs. *Rippee v. Grand Valley Mfg. Co.*, 762 F.2d 25, 26 (3d Cir.1985); *Fireman's Fund Insurance Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177–78 (3d Cir.1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). We cannot weigh the evidence or judge its credibility. *Fireman's Fund*, 540 F.2d at 1178. Further, if there is conflicting evidence that could reasonably lead to inconsistent inferences, a verdict may not be directed. *Id.* In addition, where a motion for directed verdict is made by a party carrying the burden of proof on a particular issue, we are required to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect. We must be able to say not only that there is sufficient evidence to support the finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding. *Id.* at 1177.

*Background*

The plaintiffs address their complaints to three different areas within the SCIP. The plaintiffs contend that the SCIP's policies and practices regarding the assignment of female guards to these areas constitute a violation of the plaintiffs' constitutional rights under the First and Fourth Amendments. In view of the standard of analysis regarding a motion for directed verdict, we give plaintiffs every reasonable inference in detailing their particular complaints with respect to each area.

A. Individual Cells

The SCIP holds prisoners convicted primarily of felonies and serving long sentences. Female guards began to work in the housing units at the prison in late summer of 1982. Prisoners at the SCIP are housed in two large buildings, the North and South Blocks. Each block consists of ten ranges or rows of cells and is five tiers high. The rows of cells are back-to-back so that each cell door faces outward to a walkway encompassing each tier.

In the North Block, the average cell is approximately five feet wide and eight feet long. A barred door provides access to the front of the cell. Toilets are located in

each cell on the back wall; they can easily be seen by anyone looking directly into the cell. In fact, all areas within the cell can be seen by anyone standing directly outside the cell. In the South Block, the cells are approximately two feet wider and a barred window is located to the side of the door at the front of the cell. Again, all areas within the cell, including the toilet, can be seen by a guard looking directly into the cell.

Prisoners are not permitted to place any type of covering or curtain on the cell doors, except for a "privacy panel" which is available at the prison commissary. Privacy panels stand about three feet high and cover the lower half of a cell door. The panels provide little obstruction to the view of a person standing directly outside the door.

Female guards can be assigned to any tier within either block for their work shift, except for the maximum security ranges located near the ground floor of North Block. However, assignment to a particular tier does not guarantee that a particular female guard will remain there for her entire shift. A female guard may be called away from her assigned tier to assist other guards in the cell block and may even enter the maximum security ranges if an emergency arises. Part of a guard's duties when assigned to a particular tier includes "taking count" of the inmates within their cells. In order to ascertain that each prisoner is within his assigned cell at the time of a "count," each guard is required to "see flesh, movement or hear the inmate speak before he is recorded as being present." Plaintiffs' Ex. 1.

Johnson alleges by an affidavit and unsworn statement, filed February 24, 1984, that he was twice seen naked by female guards while he was in his cell. On February 8, 1984, he claims to have been seen while using the toilet in his cell. In September or October of 1983, Johnson further claims to have been observed while he lay naked on the floor of his cell.

Plaintiff Story avers in an affidavit filed February 29, 1984, that he was observed in the nude several times by two female correctional officers. Such observations included viewings of plaintiff Story while he was using the toilet in his cell. By his later testimony, Story qualifies the term "several" as being greater than ten times and "maybe" more than a hundred.

Both plaintiffs allege that such viewings caused humiliation, mental anguish and trauma. Both profess to be particularly distressed with the prison policy forbidding privacy curtains for the cell doors, but allowing for privacy panels which must be purchased at the prison commissary. In particular, plaintiffs complain that they should not have to "purchase privacy."

Plaintiffs further allege that the SCIP began to strictly enforce its cell door obstruction policy at the same time female guards began working in the cell block; plaintiffs contend that such enforcement was intended to humiliate the plaintiffs and, in particular, the female guards.

B. Cell Block Shower Areas

Each cell block has a shower located on the bottom floor at the end opposite the entrance to each housing unit. Each shower area consists of approximately 12 shower stalls. The stalls stand side-by-side with a contiguous rear wall which supports the shower mechanism for each stall. Partitions on each side divide one from the other. The front and top of each shower stall is open, facing inward to the tiers located in the center of the blocks.

A smaller wall, approximately four feet high, is located approximately five feet in front of the stalls. This wall provides for a dressing area between it and the shower stalls. It also obstructs the view of anyone standing directly in front of the showers on the bottom floor of the cell blocks, insofar as the lower extremities of an inmate within the dressing area or shower stalls cannot be seen. We note that the shower stalls are located on a higher plane than the floor of the dressing area, i.e., an inmate must step-up into the shower stalls; thus, the wall provides less of an obstruction for those inmates within the stalls.

The wall offers no shelter from the view of anyone walking near the ends of the

wall. In addition, any guard assigned to the tiers and ranges above the showers can look down into the shower stalls with the only obstruction being a screen above the stalls. Guards on the second tier, which lies directly above the stalls, are able to look down into the showers if they walk near the guardrail at the outer edge of the walkway encompassing that tier. Guards on the upper tiers would have to look over the railings on their respective tiers in order to see into the shower area.

Plaintiff Johnson makes no claim to having been viewed in the shower areas; plaintiff Story claims to have been viewed naked in this area as part of the "several" times he claims to have been seen nude by female attendants. Plaintiff Story further avers that the shower area is routinely inspected by all guards assigned to the ranges and tiers above the showers, and he again claims to have been embarrassed and to have suffered mental anguish by such observations.

C. Gym Area Showers

The showers in the gym area of the SCIP are housed in an enclosed area which has an exterior barred door leading to an outer enclosed dressing area. An inner doorway lies between the dressing and shower areas. The shower area cannot be viewed from the outside except from the dressing area, and the dressing area is partially obscured by the walls encompassing the entire area. Plaintiffs contend that despite these obstructions, female guards routinely look into the gym showers. Plaintiff Story specifically claims to have been observed nude in these showers, again as part of the "several" times he was seen naked by female corrections officers, again causing mental anguish.

*Discussion*

A. Right of Privacy

We recognize that the plaintiffs, although inmates of the SCIP, do retain certain rights of privacy under the Fourth Amendment, which include the right not to be viewed naked by a member of the opposite sex. *See Grummett v. Rushen,* 779 F.2d 491, 493, 495–96 (9th Cir.1985), *Smith v. Chrans,* 629 F.Supp. 606, 611 (C.D.Ill. 1986). However, this right of privacy is not unlimited. As the Supreme Court has stated, "[l]oss of freedom of choice and privacy are inherent incidents of confinement." *Bell v. Wolfish,* 441 U.S. 520, 537, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447, 467 (1979). Moreover, the Constitution does not mandate that prisons which house prisoners convicted of serious crimes must be completely free of discomfort and affronts to a prisoners' dignity. *See Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59, 70 (1981). Consequently, a prisoner's right of privacy exists only so far as it is not fundamentally inconsistent with prisoner status or incompatible with the legitimate objects of incarceration *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495, 501 (1974). Similarly, the state may restrict or withdraw a prisoner's rights to the extent necessary to further the correctional system's legitimate goals and policies. *Hudson v. Palmer,* 468 U.S. 517, 524, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393, 401 (1984); *Bell v. Wolfish,* 441 U.S. at 545–46, 99 S.Ct. at 1877, 60 L.Ed.2d at 473. Institutional security has been recognized as chief among the state's legitimate goals. *Hudson v. Palmer,* 468 U.S. at 524, 104 S.Ct. at 3199, 82 L.Ed.2d at 401; *Bell v. Wolfish,* 441 U.S. at 547–48, 99 S.Ct. at 1878–79, 60 L.Ed.2d at 473–74.

At the same time, the state also has a legitimate interest in avoiding job discrimination against female guards because of their gender. *See Grummett,* 779 F.2d at 493; *Smith v. Fairman,* 678 F.2d 52, 54 (7th Cir.1982) (a state may not legally refuse to hire women as guards in a male prison and must be allowed to utilize female guards to the fullest extent possible); *Smith v. Chrans,* 629 F.Supp. at 612; *Hudson v. Goodlander,* 494 F.Supp. 890 (D.Md. 1980).

It is thus apparent that conflicting interests are involved here—the plaintiffs' right to privacy and the defendants' legitimate interest in maintaining institutional security and preventing sex discrimination. As the plaintiffs do have at least some reason-

able expectation of privacy the controlling issue becomes whether a "mutual accommodation" exists between the plaintiffs' rights of privacy and the defendants' interests regarding security and sex discrimination. *Bell v. Wolfish,* 441 U.S. at 546, 99 S.Ct. at 1877, 60 L.Ed.2d at 473; *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, 951 (1974).

Such a determination involves a three step analysis with shifting burdens of proof. *Cf. Shabazz v. O'Lone,* 782 F.2d 416 (3d Cir.), *cert granted,* — U.S. —, 107 S.Ct. 268, 93 L.Ed.2d 245 (1986) (similar but stricter standard of analysis set forth in context of First Amendment restriction by prison administration).

Step 1. First and logically, plaintiffs must show that they have in fact been viewed naked by female guards. The defendants in this case do not, however, contest that such viewings have occurred. Thus, plaintiffs have met their burden on this issue.

Step 2. In step 2, the fact finder must decide whether or not the defendants have met their burden of proving that the existing policies regarding female guards at the SCIP are reasonably necessary to further legitimate state interests. *See Pell v. Procunier,* 417 U.S. at 822, 94 S.Ct. at 2804, 41 L.Ed.2d at 501; *Hudson v. Goodlander,* 494 F.Supp. at 892–93 (where constitutional rights are involved, court has a duty to ascertain whether restrictions on such rights represent reasonable means of achieving legitimate state interests). We note, though, that defendants bear only a qualified burden of proof in that they do not have to show affirmatively that preventing or limiting any viewing of naked male prisoners by female guards would be detrimental to proper penological objectives or would constitute a present danger to security and order or would cause sex-based discrimination. *See Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629, 640 (1977). Rather, "such considerations are peculiarly within the province and expertise of correction officials, and, in the absence of substantial evidence on the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunnier,* 417 U.S. at 827, 94 S.Ct. at 2806, 41 L.Ed.2d at 504. Prison administrators are therefore awarded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to further legitimate state interests. *Bell v. Wolfish,* 441 U.S. at 547, 99 S.Ct. at 1878, 60 L.Ed.2d at 474.

Step 3. In step 3 the fact finder must determine whether the plaintiffs have shown that they are routinely or regularly exposed to female guards while unclothed, as opposed to occasional, inadvertent encounters, or (the other side of the coin) that the defendants have exaggerated their concern for institutional security and preventing sex discrimination. *See Cumbey v. Meachum,* 684 F.2d 712 (10th Cir.1982) (as a general rule, violation of prisoners' right to privacy occurs when guards regularly watch inmates of the opposite sex who are engaged in personal activities, such as undressing, using toilet facilities or showering); *Miles v. Bell,* 621 F.Supp. 51 (D.Conn. 1985) (same); *Hudson v. Goodlander, supra* (evidentiary hearing held to determine regularity of the assignment of female guards to posts where they are exposed to inmate nudity; this issue was deemed critical because neither an inadvertent encounter nor a regularly scheduled visit by a female employee at an announced time would rise to the level of constitutional deprivation); *Avery v. Perrin,* 473 F.Supp. 90 (D.N.H.1979) (no constitutional violation where *de minimus* encounters occurred); *cf. Shabazz v. O'Lone, supra* (in First Amendment context, once the state satisfies its burden, deference is to be accorded to the judgment of prison officials unless plaintiffs show by substantial evidence that such officials have exaggerated their response to security considerations or that their beliefs are unreasonable).

In view of the judicially-mandated deference to prison officials, many courts have simply begun their review of similar conflicts with the third and last step of the

analysis. Because we view this case in the context of a motion for a directed verdict, though, we will not begin with this last inquiry, but rather will explain the basis for our conclusion that insufficient evidence exists to permit any finding other than that defendants have carried their burden in step two of the right of privacy analysis. The three areas of concern with respect to observation of inmate nudity by female guards will be addressed separately.

1. Individual Cells

We note initially that defendant Ronald Marks has issued policy guidelines which were intended to accommodate concerns for maximizing the employment opportunities of female guards and the privacy rights of inmates. In a memorandum dated January 19, 1981, defendant Marks set forth the following guidelines:

> a. Corrections Officers of the opposite sex to the inmate population are not to be assigned to posts where one has to work in open view of unclothed inmates (i.e., shower, strip and search, medical/physical examination areas).
>
> . . . . .
>
> g. Corrections Officers of the opposite sex shall announce their presence when entering housing areas to avoid unnecessarily invading the privacy of inmates of the opposite sex.
>
> h. During emergency situations, any section(s) of these guidelines may be suspended by the institutional Officer in charge as necessary in coping with the situation.

Plaintiffs' Ex. 8. The SCIP has conformed with these guidelines and while female guards do work in the housing units, they are not assigned to showers or strip and search areas where they would have open view of unclothed inmates. In addition, the SCIP has adopted its own policy of posting a sign at the entrance to each cell block which warns: "Female employee on duty in cell block." Defendants' Exs. A, H.

We believe that these policies demonstrate reasonable attempts by the defendants to balance the competing concerns of maximizing the female guards' employment opportunities and deference to inmate privacy. In fact, to the extent that these policies permit female guards to work within the cell blocks, such work assignments are a reasonable accommodation of these competing interests. *See Smith v. Fairman,* 678 F.2d at 54 ("If a state is required to hire women as guards in its male prisons, it reasonably seems to follow that it must be allowed to utilize female guards to the fullest extent possible."); *Gunther v. Iowa State Men's Reformatory,* 612 F.2d 1079 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980).

Thus, defendants' "qualified burden of proof" more directly concerns the SCIP's security interests. Indeed, we note that plaintiffs' complaints also direct our attention to this issue; they do not contend that female guards should not be stationed in the housing units, but rather that more provisions for privacy, such as privacy curtains, should be made and/or allowed.

The defendants introduced testimony from Lawrence Weyandt, Deputy Superintendent of Operations at the SCIP, to demonstrate that the SCIP's policies with respect to individual cells are reasonably necessary to further prison security interests. Deputy Weyandt testified that privacy curtains are not permitted on the cell doors or even within the cells for a number of reasons. These reasons include: (1) guards must be able to see within the cells to check on the health and wellbeing of the inmates, i.e., whether they are ill or have attempted suicide; (2) guards must be able to determine whether each inmate is in his assigned cell during "lock-up," as prisoners may fake their presence within their assigned cells in order to attempt escape or stay with another inmate in his cell; (3) guards must be able to see into the cells in order to see and prevent inmate assaults, both physical and sexual; and (4) guards must also be able to see and prevent any exchange or dealing in contraband. It is out of particular concern for the possible exchange of contraband that no privacy curtains are permitted either on the cell doors or within the cell.

As to the "privacy panels" which are permitted and available at the commissary, Deputy Weyandt testified that these panels are the only coverings allowed to be placed on the doors because they alone are fire-proof. Deputy Weyandt did not know why these panels had to be purchased. However, as these panels admittedly provide little privacy, we do not believe the issue of the panel's cost is a determinative consideration for the larger issue of whether the SCIP's policy prohibiting door obstructions is reasonably necessary to further security interests.

Indeed, we see the primary focus of this step in our right of privacy analysis as concerning the question of whether any privacy curtains or panels need be provided. Based on the security concerns explained by Deputy Weyandt, and noting the deference with which his opinion is to be entitled, we conclude that defendants have sufficiently demonstrated that SCIP's policy of forbidding privacy curtains is a reasonable means of furthering security interests at the prison and that insufficient evidence exists for a reasonable person to find otherwise. Moreover, we find that defendants have sufficiently demonstrated that no reasonable alternatives exist to the present policy and again that any contrary finding would be supported by insufficient evidence.

Plaintiffs also strongly argued that the SCIP policy requiring guards to "see flesh" during count, Plaintiffs' Ex. 1, is a blatant example of the defendants' disregard for plaintiffs' privacy rights. However, as explained by Deputy Weyandt, the requirement that guards "see flesh" was not a directive for guards to invade a prisoner's privacy, but rather a requirement that guards ascertain that each prisoner is in his assigned cell. Moreover, the guards were not ordered to satisfy this directive only by literally "seeing flesh"; they could also make the determination by observing movement or hearing the inmate's voice. We believe that this policy is also a reasonable means of furthering the same security interests detailed by Deputy Weyandt in connection with the SCIP policy on privacy panels.

Plaintiffs further complain that defendants have made only token attempts to accommodate inmate privacy. As previously discussed, a sign is posted in each block to indicate that a female employee is on duty. Plaintiffs contend that the sign is inadequate, as it does not specify the particular tier to which the female guard is assigned. However, as a female guard may be called elsewhere in the block, any further specification of the female guard's work assignment would be misleading. Thus, reasonable alternatives do not exist for this practice. Moreover, testimony from Ms. Deborah Foster, a female guard at the SCIP, indicated that the presence of a female guard on a particular range is generally made known by word-of-mouth between prisoners or through recognition of the female guard's voice as she takes count or otherwise talks with prisoners. Consequently, when a female guard is required to look into the cells during a count, the prisoners usually have forewarning and can avoid any offensive exposure.

When counts are not being taken and female guards are simply patrolling the walkways of a tier, prisoners can still maintain some privacy if they desire. A guard simply walking past a cell without stopping for inspection cannot see clearly into the cell. He or she passes too quickly to make a full observation. Combined with the fact that a prisoner can turn off the overhead light in his cell and, if using the toilet, can drape a towel or article of clothing across his lap, the prisoners are not without any reasonable guarantees of privacy.

In sum, we find that defendants have met their qualified burden of proof in demonstrating that policies concerning individual cells reflect legitimate security interests and that reasonable alternatives do not exist. *Accord Grummet v. Rushen, supra.* Insufficient evidence exists to support a contrary determination.

2. Cell Block Shower Areas

As previously discussed, no female guards work in the shower areas. In fact,

the testimony of Deputy Weyandt indicated that no guards, either male or female are assigned there. He further stated that only in emergency situations will any guard enter the shower. Consequently, it is unlikely that any guards on the bottom floor of either cell block would view an inmate in the shower, unless the guard was prompted to enter the showers as a reasonable means of furthering security concerns.

Plaintiffs appear to agree with this observation as their testimony and evidence basically concerned the possibility of a female guard observing prisoners in the shower from the upper tiers. The stationing of female guards on the upper tiers is a reasonable means by the SCIP of furthering the state's interests in preventing sex discrimination. Thus, our focus turns to the SCIP's security interest policies relative to guards being stationed above the cell block showers. Testimony from Deputy Weyandt and Ms. Foster indicated that the duties of guards on the upper do not include observation of the showers below. However, if a call for assistance or sounds of an altercation came from below, any guard would be required to determine where such a call or disturbance was occurring; in deference to the prison officials' expertise, we hold this to be a reasonable response in furtherance of security interests.

To the extent that plaintiffs argue that a covering should be placed over the shower areas, we note that the existing screen already obscures full view of anyone in the showers. Further, as Deputy Weyandt testified, inmate assaults have occurred in the shower areas, and it is therefore necessary for guards in the upper tiers to be able to see and hear any disturbances which may arise in the shower area. Covering the showers area would cut down on the guards' abilities to determine whether an assault had occurred in the showers, either by sight or sound; this would enhance the possibilities of such assaults. Consequently, providing a cover would not reasonably accommodate the SCIP's security interests.

Therefore, we find that the defendants have sufficiently demonstrated that their policies concerning the showers are a reasonable means of furthering security interests and, further, that reasonable alternatives do not exist. Insufficient evidence exists to support a contrary finding.

3. Gym Area Showers

Guards are also not assigned to the immediate shower area in the gym, but any guard, including a female guard, will enter the showers if an emergency situation arises. This is again a reasonable response to security interests. Testimony from the plaintiffs and guard Foster indicated that inmates are often viewed naked by female guards in this area. However, the testimony further revealed that such observations occur not as the result of guards looking into the gym showers, but because inmates leave the enclosed dressing area complaining of overcrowding. Such observations are therefore not the result of the SCIP's violation of privacy interests, but rather the inmates' voluntary disregard for their own modesty. Any prisoner not wishing to be seen naked by a female guard can remain in the enclosed dressing area irrespective of its crowded state, and to the extent a female guard may look into that area or the gym showers, we find such observation to be related to legitimate security concerns. Thus, defendants have satisfied their burden with respect to this area of concern as well.

In sum, we find that for each area about which plaintiffs complain, defendants have produced sufficient evidence to establish that the SCIP's policies are a reasonable means of furthering interests of security and preventing sex discrimination. We find that the defendants have also shown that no reasonable alternatives exist by which to accommodate the conflicting interests involved without compromising prison security. We find further that insufficient evidence was introduced from which a reasonable person could find otherwise.

We turn therefore to the "critical issue" —whether plaintiffs have shown: (1) that the plaintiffs were regularly seen naked by female guards; or (2) that defendants' security concerns are unreasonable.

With respect to the regularity of observations we find that, giving every fair and reasonable inference to plaintiffs, they did not produce sufficient evidence to show female guards saw plaintiffs unclothed other than inadvertently on a small number of occasions. As previously discussed, plaintiff Johnson only indicates two occasions at which time he was seen naked by female guards. Such observations do not amount to a violation of plaintiff Johnson's right of privacy. *See Smith v. Chrans,* 629 F.Supp. at 611; *Miles v. Bell,* 621 F.Supp. at 57. Even plaintiff Story's averment that he was seen nude several times does not amount to routine or regular intrusions upon his privacy, given the four years during which female guards worked at the SCIP while Story was imprisoned there. *Smith v. Chrans,* 629 F.Supp. at 611.

Story later testified, however, that such occurrences happened "maybe" more than one hundred times. Both plaintiffs also allege that all prisoners are "routinely" seen naked by female guards. However, many of the "routine" observances of naked inmates have been explained as occurring in the gym area showers when naked prisoners leave the dressing area provided. Ms. Foster also testified that prisoners sometimes travel to and from the cell block showers while unclothed. Again, such occurrences do not relate to an invasion of privacy by the defendants, but rather, the prisoners' disregard for their own privacy. Also, affidavits and testimony from plaintiffs' own witness Francisco La Court Olivencia, further demonstrates that the offensive viewings at issue only occurred occasionally. Mr. Olivencia, an inmate at the SCIP, speaks of "surprise encounters" in his affidavit, and he further testified that the female guards have never abused the situation.

Moreover, while plaintiffs' evidence does indicate the possibility of routine observations, it is the number of actual viewings which is relevant, not the potential for such observation. *Grummett v. Rushen,* 779 F.2d at 491. Aside from plaintiffs' own allegations, no evidence indicates that female guards regularly view plaintiffs or any other prisoners when such individuals are naked, other than those occasions where the prisoners would choose not to guard their privacy. Thus, we find that plaintiffs have produced insufficient evidence from which a jury could find that female guards routinely observed unclothed inmates in contravention of the prisoners' privacy concerns.

As to the reasonableness of defendants' security concerns, we have already indicated that there exists a similar lack of evidence to support a jury finding in plaintiffs' favor. Accordingly, we further conclude that a jury could not reasonably find the defendants have not used reasonable means to accommodate plaintiffs' privacy interest when balanced against the SCIP's legitimate interests in security and preventing sex discrimination.

Finally, to the extent plaintiffs argue that defendants intentionally created or enforced certain policies to humiliate the prisoners at the SCIP, we recognize that defendants cannot subject prisoners to maliciously motivated infringements of prisoners' rights of privacy. *Hudson v. Palmer,* 468 U.S. at 528, 104 S.Ct. at 3201–02, 82 L.Ed.2d at 404. However, we again find that plaintiffs have produced insufficient evidence to show such an intentional act. Instead, plaintiffs based their arguments in this regard on the female guards' reaction to their assignments to the cell block, attempting to show a possible conspiracy to humiliate the female guards because they, or female guards in general, asserted their rights against sex discrimination in prison settings. Such arguments have no relevance to this case as they relate to the female guards' rights, not the rights of plaintiffs as prisoners. *See Mattas v. Supreme Court of Pennsylvania,* 576 F.Supp. 1178, 1182 (W.D.Pa.1983) (civil rights litigant may only insert his legal rights as a basis for decision, not those of a third party).

Therefore, we will grant defendants' motion for a directed verdict as to plaintiffs' claims under the fourth amendment.

### B. Right to Freedom of Religious Expression

Plaintiff Johnson's claim to first amendment protection is based on his contention

that he belongs to a religious group known as the Spiritual Order of Universal Beings. As a member or follower of this group, Mr. Johnson claims to have adopted part of the teachings of the Koran (or Qur'an), the source of law and spiritual guidance for followers of the Muslim faith. *See* Affidavit of Carl L. Johnson, ¶ 2, filed with Plaintiff Johnson's Motion for Leave to File a First Amended Complaint and Joinder of Parties Plaintiff. In particular, Mr. Johnson claims to adopt and believe the "modesty requirement" of sura (chapter) 24 of the Koran. *Id.*, at ¶ 3. Generally stated, this modesty requirement forbids an individual from making a "brazen stare" at another individual. It further prohibits any individual, either male or female, from exposing his or her naked body to strangers, i.e., persons other than the individual's "mate." Plaintiff Johnson contends that the SCIP's operational policy with respect to the work duties of female guards prevents him from adhering to this modesty requirement as they "routinely observe" his "private parts." *Id.*, at ¶¶ 4–6. Therefore, Mr. Johnson argues, his First Amendment right to freedom of religious expression has been violated.

Plaintiff Walter Story claims violation of the same first amendment right. His claim to freedom of religious expression is based, however, on his sworn statement that he is of the Muslim faith and has a "sincere and genuine spiritual belief" in "the concept of Allah" and, further, that he adopts the teachings of the Koran and, in particular, the aforementioned modesty requirement. *See* Affidavit of Walter Story, filed with Plaintiff Story's Motion to Amend Complaint.

As threshold requirements to a claim based on First Amendment protection for alleged religious beliefs, plaintiffs must show that their beliefs are: (1) sincerely held; and (2) religious in nature. *Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025 (3d Cir.1981). We find that neither plaintiff has met these requirements. As to plaintiff Johnson, while his beliefs may be sincere, his claimed beliefs in the Spiritual Order of Universal Beings (the "Order") do not qualify as a religion. With respect to plaintiff Story, while his Muslim beliefs qualify as a religion, insufficient evidence exists for a jury to find that his beliefs are sincere.

1. The Spiritual Order of Universal Beings as a Religion

The Court of Appeals for the Third Circuit has adopted three indicia to determine the existence of a religion. *Africa v. Commonwealth of Pennsylvania*, 662 F.2d at 1032. According to these criteria, a religion should: (1) address fundamental and ultimate questions having to do with deep and imponderable matters; (2) be comprehensive in nature, consisting of a belief-system as opposed to an isolated teaching; and (3) be recognized by certain formal and external signs. *Id.*

We find that, using these indicia, the Order does not as a matter of law qualify as a religion. Hiram R. Johnston, original plaintiff in this action, is the recognized "spiritual leader" of the Order. He testified on behalf of plaintiffs and explained the Order's belief system as being eclectic; that is, each member or follower of the Order may adopt the beliefs of any other religion or philosophy in order to lead the individual to recognition of his identity as a being of the universe. Mr. Johnston explains in a letter:

> [T]he Spiritual Order of Universal Being is *not* a "sect" or off-spring of any existing religious entity, e.g. Suni Muslims are a "sect" of the Islamic faith just as Zen is a specific "sect" of Buddhism. On the contrary the Spiritual Order of Universal Being has not dissented or otherwise schismatically severed itself from any existing faith to acquire an identity of its own. Nor is it nonconformist in its views towards other "established" religious beliefs. The Spiritual Order of Universal Being is, in fact, a completely ancient recognition predicated upon principles of Universal Being. When one becomes themself s/he automatically sheds any and all distinguishing characteristics of racial identity such as black, white, puerto rican, italian, etc. and resumes the most ancient conception as a

> being of the Universe, free to undertake the studies of any specific spiritual practice, combination of such/or refrain as one may choose, whatever proves most suitable to fulfilling the specific spiritual requirements of the individual.

Plaintiffs' Ex. 11. Mr. Johnston further indicated in his testimony that the only beliefs "universally" adopted by "universal beings" are the requirement of a special diet and, conveniently, the modesty requirement of the Koran.

We find such beliefs to be remarkably self-serving, especially in the prison context, and quite similar to the MOVE philosophy discussed and held not to be a religion in the *Africa* case. Like MOVE, the Order members share but one fundamental concern—obtaining a way of life, an identity, which rises above civilization and its established boundaries. As the court in *Africa* concluded, such a fundamental concern does not however equate with the fundamental and ultimate questions which serves as the first indicia of a religion. *Africa,* 662 F.2d at 1035.

The Order, like MOVE, also lacks a "comprehensive belief system." Instead, followers of the Order are free to pick and choose those morals, beliefs, etc. which best suit the individual. The Order, therefore, does not bear the second indicia of religion either. *Id.* at 1035 ("We decline to adopt such a self-defining approach to the definition of religion.").

Finally, we perceive none of the structural characteristics of religion outlined in *Africa. Id.* at 1035–36. Followers of the Order are free to celebrate those holidays or observe those religious functions which help fulfill the individual's personal spiritual requirements. However, the Order does not have any structural characteristics of its own. Thus, this final indicia is also not satisfied. Accordingly, we conclude that the Order is not a religion and, therefore, that plaintiff Johnson's first amendment claims are without merit.

2. Sincerity of Plaintiff Story's Religious Beliefs

"Without some sort of required showing of sincerity on the part of the individual ... seeking judicial protection of its beliefs, the first amendment would become a 'limitless excuse for avoiding all unwanted legal obligations.'" *Africa,* 662 F.2d at 1030. Indeed, such an inquiry is especially important in free exercise of religion cases in prison because of the incentive to falsely allege religious beliefs in order to counter prison policy. *Id.* at 1030 n. 9. We find that upon testing this inquiry, insufficient evidence exists from which a jury could conclude that Story held sincere Muslim beliefs during the time of the alleged violations.

Story, in his own testimony, agreed that he abandoned his Muslim beliefs after his "first couple of years in prison" due to the pressures of prison life. As Story first came to the SCIP in June of 1979, such abandonment would have occurred by late 1981, almost a full year before female guards began to work in the housing units and allegedly infringe upon Story's religious beliefs. Story further testified that he joined the instant complaint because he basically believed his human dignity had been violated and that this violation was primarily an affront to his personal philosophy, which cuts across all religions. Thus, while Story makes the bare statement that his beliefs were sincere and further indicates that he "registered" as a Muslim when entering the SCIP, we find such evidence insufficient for a jury to reasonably find his beliefs to be sincere.

In fact, Story's first amendment complaints appear to be nothing more than another hook upon which to hang his basic concerns with human dignity. To that extent, Story's complaint has a proper basis in the fourth amendment's privacy protection. However, as previously discussed, such rights of privacy have not been violated in this case. In any event, Story has not shown his beliefs to be sincere and the defendants are also entitled to judgment with respect to his first amendment allegations.

We note finally that even if the Order were a religion and Story's beliefs

sincere, plaintiffs first amendment complaints would otherwise fail based on the small number of plaintiffs' actual nude exposures to female guards, and the reasons given in finding that a reasonable accommodation exists in connection with the plaintiffs' rights of privacy. We believe that even under the stricter first amendment standards of *Shabazz v. O'Lone supra,* and in the present context of a motion for directed verdict, defendants have met their burden of proof and plaintiffs have failed to produce sufficient evidence to support a jury finding in their favor. *See Shabazz,* 782 F.2d at 420 (state must show that the challenged regulations were intended to serve, and do serve security interests and that no reasonable method exists to accommodate prisoners' religious beliefs).

Therefore, we will also grant defendants' motion for directed verdict as to plaintiffs' claims under the first amendment and enter judgment in this action for defendants and against plaintiffs. An appropriate order will issue.