## Commonwealth v. Lower

*William Z. Scott,* for township.
*Joseph A. Lower Jr.,* pro se.

LAVELLE, *P.J.,* April 12, 1989 — In this summary appeal, defendant raises the intriguing question whether the East Penn Township Burning Ordinance violates his First Amendment right to free expression of his religion. It is a case of first impression.

Defendant, Joseph A. Lower Jr., is charged with violating the ordinance when the Ku Klux Klan burned a wooden cross on his property on July 4, 1988.

## FACTS OF THE CASE

The facts are undisputed. Lower, a member of the KKK, and his wife, for the sum of one dollar, leased

their East Penn Township farm to the Invisible Empire Knights of the Ku Klux Klan for a July 4 rally. Before the KKK appeared, Police Chief Richard Gross informed defendant that an East Penn Ordinance prohibited any burning in the Township after dark. Specifically, he pointed to the following section of Township Ordinance no. 9: "*Section Four* — No fire shall be allowed to burn, on any day, before the astronomical sunrise and after the astronomical sunset."

On July 4, 1988, 36 white-sheeted members of the KKK assembled and, in view of some 200 to 300 onlookers, participated in a rally which included speechmaking and marching in the open fields on Lower's farm. Sunset on that day occurred at 8:36 p.m., Eastern Daylight Time. At approximately 9:40 p.m., Eastern Daylight Time, members of the KKK ignited a large wooden cross, which lit up the night sky and burned for about half an hour.

Professional fire equipment and privately owned tools suitable for control of field fires and personnel to use them were present. The grass on defendant's field was cut low and neither person nor property was endangered by the cross burning. A citation against Lower for violation of the ordinance was issued by Chief Gross and after conviction before District Justice Appleton, he appealed to this court.

At the February 16, 1989 hearing Mark W. Thomas testified that he was a state chaplain in the KKK chapter located in Reading, Pa., and that the cross-lighting ceremony is a necessary and integral part of the religious rituals of the Ku Klux Klan. He explained:

"It is the belief of the Klan that the cross as a burning fire be lifted upon a hill where all people

can see it as a light unto the world pursuant to the religious traditions of the Klan as a Christian organization.

"They believe that it is necessary to advance their religious doctrines; that we do it relevant (sic) to religious training and belief; that this belief is truly and sincerely held, and basically understood by all members who participate."

Mr. Thomas also described the significance of the cross-burning ceremony:

"[C]hrist was the light of the world, and that (sic) ordered people to lift their light above all men on the hilltop for all to see . . . the circle, the inner and outer circle of people that gather around the cross and, as you mentioned, were around the cross to protect it from the fire . . . from spreading, also represent the inner and outer circle which is representative of the white race, whose invention was the wheel, and it's further stated in the book of Ezekiel of the wheel within a wheel that represented the race of God."

On cross-examination, Thomas stated that the Bible is the KKK religious charter, that they have no ordained ministers but everyone is ordained by God to speak the word of God and that the Klan has a building in Reading, Pa.

## DISCUSSION

Lower admits that he violated the burning ordinance but moves to dismiss the citation on two grounds: (1) that the prosecution was discriminatory as to him and (2) that the cross-burning ceremony was religious in nature, that it was a necessary part of his religion and the application of the ordinance to him infringes unconstitutionally on his freedom of religion.

Lower first argues that he is a victim of selective prosecution on the part of the township because of his membership in the Ku Klux Klan.

If defendant asserts an affirmative defense he bears the burden of proof on it. *United States v. Moon,* 718 F.2d 1210, 1224 (3d Cir. 1983). Further, it is well-settled that:

"[T]he person asserting (a claim of selective prosecution) bears the burden of establishing prima facie both: (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based on such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Id.,* at 1229, quoting *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974).

In the case sub judice, defendant has failed to produce any evidence that there had been any unequal application of the law. Defendant testified that he was unaware of any other prosecutions under the burning ordinance. However, he failed to proffer any reliable evidence to buttress that claim. We are left, therefore, with his bald assertion that the township has selectively prosecuted him. This claim is wholly without merit.

We shall now address the more serious claim of alleged infringement of religious freedom.

Lower accurately and correctly points out in his memorandum of law that the constitutional protection afforded by the First Amendment is not limited to orthodox religious practices, *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed 1148 (1944).

Federal case law teaches us, however, that two threshold requirements must be met before alleged religious beliefs will receive First Amendment protection. The court must decide whether the beliefs avowed are (1) sincerely held, and (2) religious in nature, *Africa v. Commonwealth of Pennsylvania,* 662 F.2d 1025 (E.D.Pa. 1981); see also *Johnson v. Pennsylvania Bureau of Corrections,* 661 F.Supp. 425 (W.D.Pa. 1987). We will address each requirement.

In determining the sincerity of defendant's beliefs, we are not unmindful that "it is inappropriate for a reviewing court to attempt to assess the truth or falsity of an announced article of faith." *Africa* at 1030. However, "while the 'truth' of a belief is not open to question, there remains a significant question whether it is 'truly held.' " *United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 863 (1965).

Although Lower did not testify that he sincerely believed in the tenets of the KKK, there is sufficient evidence to hurdle the requirement of sincerity. Mr. Thomas stated that all members of KKK engage in the cross-lighting ritual to advance their religious doctrines and their beliefs are "truly and sincerely held." We also have the evidence that Lower leased his farm to the KKK without compensation. Moreover, he impressed the court with the sincerity of his testimony and advocacy for the Klan throughout the hearing.

We turn then to the critical question: whether Lower's beliefs, no matter how sincerely held, are religious in nature.

In grappling with this issue, we are guided by the profound caveat of the distinguished jurist, Arlin Adams, in the *Africa* case, *supra.*

"Few tasks that confront a court require more circumspection than that of determining whether a

particular set of ideas constitutes a religion within the meaning of the First Amendment. Judges are ill-equipped to examine the breadth and content of an avowed religion; we must avoid any predisposition toward conventional religions so that unfamiliar faiths are not branded mere secular beliefs. 'Religions now accepted were persecuted, unpopular and condemned at their inception.' *United States v. Kuch,* 288 F.Supp. 439, 443 (D.D.C. 1968). Nonetheless, when an individual invokes the First Amendment to shield himself or herself from otherwise legitimate state regulation, we are required to make such uneasy differentiations."

Initially, we note that we have found no state or federal case which has held the KKK to be a religion, or even addressed the question whether it is a religion.

The federal courts, however, have adopted three "useful indicia" to help us determine the existence of a religion and we adopt them here:

"First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs." *Malnak v. Yogi,* 592 F.2d 197 (1979).

Using these indicia, we find that the KKK, on the record before us, does not, as a matter of law, qualify as a religion.

### Fundamental and Ultimate Questions

"Traditional religions consider and attempt to come to terms with what could best be described as 'ultimate' questions — questions having to do with, among other things, life and death, right and wrong,

and good and evil. Not every tenet of an established theology need focus upon such elemental matters, of course; still, it is difficult to conceive of a religion that does not address these larger concerns. For, above all else, religions are characterized by their adherence to and promotion of certain 'underlying theories of man's nature or his place in the Universe.' " *Founding Church of Scientology v. United States,* 409 F.2d 1146, 1160 (D.C.Cir. 1969).

Lower presented no evidence whatsoever on the fundamental concerns of the KKK. We do not know what position the KKK takes with respect to matters of personal morality, human mortality or the meaning and purpose of human life. We are told by Mr. Thomas that the KKK has "religious doctrines"; but he did not tell us what they were, how the KKK is committed to them or the impact they have on the conduct of members of the KKK. Clearly, Lower fails to satisfy the "ultimate ideas" criterion.

### Comprehensiveness

In *Malnak v. Yogi,* 592 F.2d 197 (3d Cir. 1979), the court pointed out that a religion must consist of something more than a number of isolated, unconnected ideas. "A religion is not generally confined to one question or one moral teaching; it has a broader scope. It lays claim to an ultimate and comprehensive 'truth.' " 592 F.2d at 209.

Again, we cannot ascertain from the record before us that the KKK lays claim to any comprehensive belief system. Defendant's testimony was primarily directed to explaining how the cross-lighting ceremony was part of the religious ritual of the KKK. No evidence was presented, however, to explain the beliefs or the philosophy of the Klan. To say that the Bible is the charter of the Klan does not qualify it as a "comprehensive belief system" because we are not

told what morals, beliefs, etc. in the Bible they embrace and follow nor how they interpret what is found there.

### Structural Characteristics

We are told in *Africa, supra,* that a religion should also have such formal or surface signs as "formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, observance of holidays and other similar manifestations associated with the traditional religions." There is apparently no organizational structure in the KKK since Mr. Thomas told us all members are ordained by God to be ministers. Although Mr. Thomas testified he was a chaplain, he did not tell us what duties or benefits if any, the title conferred upon him. There was no evidence of any holidays celebrated by the KKK. We find in the record virtually no formal identifying characteristics in the KKK common to most organized religions. We do not believe that the cross-lighting ritual, the white robes and the rallying satisfy the structural characteristics requirement.

Were we to conclude, on this record, that the KKK is a religion under the First Amendment, we would have to so qualify every group who came into court with a Bible, a lighted match and a claim to be a Christian.

We hold, therefore, that the KKK is not a religion and therefore, defendant Lower's First Amendment claim is meritless. We, therefore, enter the following

### ORDER

And now, April 12, 1989, we find the defendant, Joseph A. Lower Jr., guilty of violating section 4 of Ordinance no. 9 of East Penn Township's ordinances.