**Gertrude CSIZMADIA, et al., Plaintiffs,**

v.

**William FAUVER, et al., Defendants.**

**Charles ALLEN, et al., Plaintiffs,**

v.

**William FAUVER, et al., Defendants.**

**Civ. Nos. 88–786(GEB), 89–4928(GEB).**

United States District Court,
D. New Jersey.

Sept. 17, 1990.

**484**

Douglass L. Derry, Kenneth A. Schoen, Deputy Atty. Gen., Richard J. Hughes, Trenton, N.J., for State of N.J.

Lance Kassak, McCarter & English, Newark, N.J., for plaintiff Allen.

Robert Fagella, Zazzali, Zazzali, Fagella & Nowak, Newark, N.J., for plaintiff Csizmadia.

## MEMORANDUM AND ORDER

GARRETT E. BROWN, Jr., District Judge.

In these consolidated actions, the Court is asked to resolve a conflict between the employment rights of prison guards working in the New Jersey Department of Corrections and the constitutional rights of the prisoners they guard. Gertrude Csizmadia is a female corrections officer at the Garden State Reception and Corrections Facility and represents the class of female corrections officers working in the New Jersey Department of Corrections ("the Csizmadia plaintiffs"). William Hundley is a male corrections officer at New Jersey's only all-female prison, the Edna Mahan Correctional Facility for Women. He represents the class of male officers employed at that prison ("the Hundley plaintiffs").[1] The Csizmadia and Hundley plaintiffs[2] have brought suit pursuant to Title VII[3], 42 U.S.C. §§ 1983, 1985, and 1988, and New Jersey's Law Against Discrimination, N.J. S.A. 10:5-1 *et seq.* ("NJLAD"), naming as defendants the New Jersey Department of Corrections ("DOC"), DOC Comissioner William Fauver, Garden State Reception and Corrections Facility Administrator Donald Zelinski, and former Bayside State Prison Administrator Calvin Neubert. They allege that the DOC's policy of designating certain positions as "male only" or "female only" is discriminatory.

---

1. The original complaint in this action named William McLaughlin as the class representative for male corrections officers at the Edna Mahon Facility. Hundley joined as a named plaintiff in this action by Court order dated February 27, 1989.

2. Joining the Csizmadia and Hundley plaintiffs in this action is PBA Local 105, the sole collective bargaining representative for corrections officers in New Jersey.

3. Plaintiffs did not assert a Title VII claim in the original complaint, but added the claim in an amended complaint filed July 25, 1988.

Charles Allen is an inmate at East Jersey State Prison, and represents a class of forty-five male inmates incarcerated there ("the Allen plaintiffs"). The Allen plaintiffs complain that their rights of privacy and free exercise of religion are violated by the DOC's policy of allowing female guards to patrol the housing units where they may see prisoners totally naked or in states of undress while engaged in basic personal activities such as using the toilet. They name as defendants Commissioner Fauver, East Jersey State Prison Administrator John Rafferty, East Jersey State Prison Chief Deputy Thomas Julian, and ten East Jersey State Prison corrections officers.[4]

In the midst of this controversy stands the DOC, which finds itself in the position of having its policies challenged from two contradictory sides. Besides having to balance the competing concerns of officers' employment rights and prisoners' privacy and religious rights, the DOC also must ensure that any policy it follows does not compromise security or the orderly running of its prisons. This matter now comes before the Court on cross-motions for summary judgment by the defendants and the Csizmadia, Hundley, and Allen plaintiffs.

## I. FACTUAL BACKGROUND

The parties have stipulated to the following facts. The DOC employs approximately 4,500 corrections officers, approximately ten percent of which are female. Assignments within the prison system generally are awarded on the basis of bids, and are assigned on the basis of seniority. If an assignment is designated "male only" or "female only," however, officers of the opposite sex will not receive that assignment regardless of seniority. Because the prisons need to be staffed around the clock, the DOC has divided assignments into three shifts. The total number of assignments available changes with each shift.

Over the last few years, the DOC has removed some gender restrictions on the assignments and duties corrections officers may undertake. Since July 1986, correction officers have been assigned, regardless of gender, to secured control booths, store rooms or canteens, cookhouses, officers' dining rooms, recreational areas, academic and vocational school areas and supervision of inmate organizations. As of October 17, 1988, corrections officers have been allowed to conduct pat frisks of inmates regardless of gender, and have been permitted to strip search inmates of the opposite sex under emergent conditions as ordered by the superintendent of the correction facility.

At the time the Csizmadia plaintiffs filed suit, the DOC had designated as "male only" assignments on any male housing unit, transportation details involving male inmates, a percentage of special assignment posts,[5] and other posts, including visitation, intake, and work details involving male inmates. Similar restrictions applied to male corrections officers working at the Edna Mahan facility.

The DOC amended its assignment policy on September 1, 1989. The amendments allowed opposite-sex corrections officers to work on housing units requiring the presence of two or more officers, provided one officer on the assignment is the same sex as the inmates. If only one officer is assigned to a unit, that officer must be the same sex as the inmates. For the purpose of relief staffing during officer meal breaks, a single officer of the opposite sex may staff the housing unit alone for a thirty-minute meal period. Opposite-sex officers now also may work on transportation details, so long as one of the officers on the detail is the same sex as the inmates. Various positions, however, remain gender-restricted. In addition to the above restrictions on certain positions in the housing

---

4. For ease of exposition, the Court will refer to the defendants in both the *Csizmadia* and *Allen* actions collectively as defendants.

5. When a corrections officer is assigned to a "special assignment" post, the officer is part of a pool of officers that may be assigned to any post

in the prison as conditions necessitate. The percentage of "male only" or "female only" special assignments in each prison reflects the number of "male only" or "female only" positions in the prison at large.

units and transportation details,[6] the DOC still designates as gender-restricted certain special assignment and substitute officer positions, as well as assignments to intake and visitation.

Officers assigned to housing units have the right and responsibility to view or observe inmates in shower areas in an attempt to detect contraband or any other violation of inmate disciplinary rules. Officers in housing units also may perform unannounced cell inspections during which time an inmate might be undressed or using the toilet. Thus, if a female officer is assigned to a male housing unit, it is possible, if not likely, that she will view male inmates naked in the shower, or that she will view them naked or using the toilet in their cells. Plaintiff Allen avers that, to his knowledge, there have been over 600 such viewings. Officers assigned to transportation details must accompany the inmate when he uses public toilet facilities.

Very few corrections officer assignments in New Jersey require strip searching as a part of an officer's regular routine and responsibilities. Intake and transportation officers routinely strip search prisoners upon their entering and leaving the prison, and visitation officers regularly perform strip searches on inmates following any contact visit within an institution. As noted above, assignments to visitation and intake positions remain gender restricted, and assignments to transportation details remain restricted as to approximately half the assignments. *See supra* note 5.

## II. ISSUES

The Csizmadia and Hundley plaintiffs claim that the DOC's assignment policy violates their civil rights by, among other things, denying them employment and promotional opportunities, overtime pay, and vacation time. They assert that, despite the recent change in policy, the vast majority of housing unit assignments call for only one officer per housing unit, and that they are prevented *de facto* from working in a

large number of jobs in the prison system. Moreover, they contend, the prisoners' privacy rights do not outweigh their employment rights, and should not prevent the elimination of all gender-based restrictions on job assignments. They further contend that any adverse impact on prisoners' rights by the eradication of sex-based restrictions in the housing units may be ameliorated by the DOC or the prisoners themselves. Specifically, they argue that the DOC could provide prisoners with privacy curtains in their cells, order all opposite-sex officers working in a housing wing to announce random inspection of cells, and install mottled or translucent barriers in the showers so that corrections officers would view the prisoners' silhouettes without viewing their bodies. They further suggest that the prisoners themselves could protect their privacy interests by wearing towels to the showers, and draping towels over their laps when using the toilet. The Csizmadia and Hundley plaintiffs do not at this time seek removal of sex-based distinctions in jobs that involve routine strip searching of inmates. Tr. at 16:10–21 (June 13, 1990) [hereinafter Tr.].

At this point in the litigation, the Allen plaintiffs challenge only the recent amendments to the DOC policy concerning housing units. They assert that their regular surveillance by female guards while either naked or in states of undress violates their privacy rights. They further contend that such surveillance also violates Muslim and certain Christian prisoners' First Amendment rights to free exercise of religion. The Allen plaintiffs join with the Csizmadia and Hundley plaintiffs in suggesting that the DOC could make further accommodations for prisoners' privacy rights by placing doors or curtains in the shower area, by prohibiting surprise cell inspections by officers of the opposite sex, and by requiring opposite-sex officers to announce themselves before any inspections.

The defendants argue that the DOC policy should be upheld because the policy

---

**6.** Under the recent amendments, when two or more corrections officers are assigned to the same housing unit or transportation detail, only one of the assignments is considered gender restricted.

represents a reasonable accommodation between the prisoners' and officers' rights, and is reasonably related to legitimate penological interests. They further argue that all the accommodations proposed by plaintiffs create unacceptable risks to the security and orderly running of the prison. Additionally, defendants raise a number of immunity arguments, namely: 1) they are not persons within the meaning of 42 U.S.C. § 1983; 2) the suit is barred by the Eleventh Amendment; and 3) they are entitled to qualified immunity. At oral argument, defense counsel conceded that any qualified immunity would apply only to suits against the defendants in their individual, and not official capacity. Counsel further conceded that the Eleventh Amendment defense would apply only to claims for damages, not injunctive relief. Tr. at 30:21–31:18.

## III. ANALYSIS

Before reaching the merits of the summary judgment motion, the Court first addresses the immunity defenses raised by defendants.

### 1. *State Immunity Under § 1983*

■ In *Will v. Michigan Dept. of State Police,* — U.S. —, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Supreme Court held that states and state officials acting in their official capacity are not "persons" under § 1983, and therefore cannot be sued under the statute. Defendants argue that plaintiffs in both suits have in essence alleged only official-capacity suits against them, and therefore the actions must be dismissed under *Will.*

Defendants' argument has merit as it applies to the DOC as a named defendant. *Will* mandates that if an entity qualifies as an arm of the state for Eleventh Amend-

ment purposes, the entity is not a person under § 1983. *Id.* 109 S.Ct. at 2309–11. Plaintiffs do not seriously contest that the DOC is a state agency. Moreover, the Court is satisfied that, under the Third Circuit's en banc decision in *Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655 (3d Cir.) *cert. denied,* — U.S. —, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989), the DOC qualifies as an arm of the state for Eleventh Amendment purposes. Accordingly, the § 1983 action against the DOC must be dismissed. *Will,* however, applies only to claims arising under § 1983, and does not apply to actions under Title VII.[7] Therefore, while the Court will dismiss the § 1983 action against the DOC, it will not dismiss the Title VII action.

■ As to the remaining individual defendants, however, the protection of *Will* is unavailable. Although *Will* immunizes state officials from being sued in their official capacity, *see id.* 109 S.Ct. at 2311–12, it does not extend so far as to protect them from being sued in their individual capacity. *See Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). In *Graham,* the Supreme Court reiterated the distinction between official-capacity and individual-capacity suits:

Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.... Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'

*Id.* at 165, 105 S.Ct. at 3105 (citations omitted).

■ In determining whether the action is an individual or official-capacity action, this Court may not rely solely upon the wording of the complaint. *See Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 543,

---

**7.** As the Court noted in *Will,* the scope of the Eleventh Amendment is relevant in limiting the scope of liability under § 1983. *Will,* 109 S.Ct. at 2309. The Eleventh Amendment, however, does not bar federal claims for prospective injunctive relief against the state. *See Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984) (citing *Edelman v. Jordan,* 415 U.S. 651, 666–67,

94 S.Ct. 1347, 1357–58, 39 L.Ed.2d 662 (1974)). Backpay under Title VII similarly is not barred, as it is considered equitable relief, not damages. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 415–17, 95 S.Ct. 2362, 2370–72, 45 L.Ed.2d 280 (1975). Accordingly, Title VII relief is not limited by the Eleventh Amendment, and the *Will* immunity is inapplicable.

106 S.Ct. 1326, 1332, 89 L.Ed.2d 501 (1986).[8] Rather, it must make such a determination by considering "the course of proceedings." *Graham*, 473 U.S. at 167 n. 14, 105 S.Ct. at 3106 n. 14; *Brandon v. Holt*, 469 U.S. 464, 469, 105 S.Ct. 873, 876, 83 L.Ed.2d 878 (1985).

◼ The course of proceedings in this case make clear that defendants are being sued in their individual capacities. It appears that defendant Fauver, as Commissioner of the DOC, as well as defendants Neubert, Zelinski, Rafferty, and Julian, are alleged to have directly deprived plaintiffs of their rights through the promulgation of an unconstitutional policy. The defendant corrections officers are alleged to have violated the Allen plaintiffs' constitutional rights by viewing them naked or in states of undress. Thus, although these defendants may be sued by virtue of actions they allegedly took under color of state law, it is evident that the suit against them is an individual-capacity suit.

### 2. *Eleventh Amendment Issues*

◼ Having determined that the suit against all defendants except the DOC is an individual-capacity suit, resolution of the defendants' Eleventh Amendment defense becomes simplified. Since the Supreme Court's decision in *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), it has been hornbook law that a state official sued in his individual capacity does not enjoy the protections of the Eleventh Amendment. Accordingly, the Eleventh Amendment argument must fail as to the individual defendants. The NJLAD claim against the DOC, however, is barred under the Eleventh Amendment. *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

### 3. *Qualified Immunity*

In addition to seeking injunctive relief, all plaintiffs seek to collect damages from the defendants. Defendants argue that they are immune from liability on damages under the doctrine of qualified immunity.

Qualified immunity shields government officials from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The purpose of qualified immunity is to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 344–45, 106 S.Ct. 1092, 1097–98, 89 L.Ed.2d 271 (1986). Application of the immunity depends upon "the objective legal reasonableness" of the official's action assessed in light of the legal rules that were "clearly established" at the time the action was taken. *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038. For a right to be "clearly established,"

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039.

The Court first considers whether either the prisoners' or the corrections officers' rights were clearly established within the meaning of *Anderson* at the time they filed their respective suits.

◼ Whether the defendants are entitled to qualified immunity regarding the Allen plaintiffs' claims depends on whether the Allen plaintiffs had a clearly established privacy or free exercise right in not being viewed naked or in states of undress by female corrections officers at the time their suit was filed. The Court finds that no such rights were clearly established.

---

**8.** The Csizmadia and Hundley plaintiffs name Fauver, Neubert, and Zelinski in their individual capacities only. The Allen plaintiffs named Fauver, Rafferty, and Julian in their official and individual capacities, and do not specify as to the ten corrections officers.

Although numerous cases have been reported concerning conflicts between correction officers' employment rights and prisoners' constitutional rights, these cases are either inconclusive or materially distinguishable on their facts.[9] For example, in *Johnson v. Pennsylvania Bureau of Corrections*, 661 F.Supp. 425 (W.D.Pa.1987), male prisoners brought suit against the Pennsylvania Bureau of Corrections, its Commissioner, and the Superintendent of the State Correctional Institution at Pittsburgh ("SCIP"), challenging recent assignments of female officers to various positions throughout the jail. After a nonjury trial, the district court granted a directed verdict in favor of the plaintiffs, holding that, *inter alia*, the prison's security interests were reasonable and that the number of actual viewings was so small that they did not amount to a violation of the prisoners' constitutional rights.

These factors also dictated the result in *Grummett v. Rushen*, 779 F.2d 491 (9th Cir.1985), in which the Ninth Circuit affirmed a grant of summary judgment against prisoners challenging assignment of female officers to male housing units. *Accord, Smith v. Chrans*, 629 F.Supp. 606 (C.D.Ill.1986) (prisoner's case dismissed when prisoner alleged nothing more than occasional and inadvertent sightings by female prison employees of inmates in cells or open shower or toilet facilities engaged in basic bodily functions). See also *Avery v. Perrin*, 473 F.Supp. 90 (D.N.H.1979), in which a prisoner claimed that assignment of a female officer to deliver mail to the inmates in their cells violated his privacy rights because on occasion she would view him either naked or in states of undress. The district court granted summary judgment against the plaintiff, holding that, because the mail clerk passed his cell at almost exactly the same time every day,

plaintiff could regulate his daily routine so as to avoid any invasions of his privacy.

Moreover, the Court is aware of at least two cases in which courts have found that assignment of opposite-sex officers to positions which involved the surveillance of inmates naked or in states of undress violated the prisoners' privacy rights. In both cases, however, the courts themselves fashioned a remedy by either removing the opposite-sex officers from their posts, or by accommodating prisoners' rights in other ways. In *Hudson v. Goodlander*, 494 F.Supp. 890 (D.Md.1980), the district court found in favor of the inmates' privacy interests, but issued an injunction which did little more than slightly modify voluntary steps taken by the department of corrections to accommodate the prisoners' privacy, which included gender restriction on assignments made to the housing units and recreation area showers. *Id.* at 893–94. In another case, *Forts v. Ward*, 471 F.Supp. 1095 (S.D.N.Y.1979), *vacated and remanded in part*, 621 F.2d 1210 (2d Cir.1980), the district court found after trial that assignment of male officers to female housing units violated the female inmates' privacy rights, and fashioned a remedy allowing male officers to continue serving in all capacities in the all-female prison. These changes included erection of shower screens, announcement of morning roll call five minutes in advance so that inmates could cover themselves before being viewed, and prohibiting male officers to work the night shift, where there was a risk that male officers would view naked inmates as they slept. The Second Circuit affirmed the district court's remedy with the exception of the prohibition on male officers working the night shift, finding that distribution of proper modest sleepwear was a less intrusive means of protecting the officers' and the prisoners' rights.

9. It appears that the instant case is one of first impression in this district. Moreover, the Court is unaware of any decision by the Third Circuit which dealt directly with a conflict between the employment rights of prison officers and the constitutional rights of prisoners. One case, *Rider v. Commonwealth of Pennsylvania*, 850 F.2d 982 (3d Cir.), *cert. denied*, 488 U.S. 993, 109 S.Ct. 556, 102 L.Ed.2d 582 (1988), arose out of a challenge by male prison guards to Pennsylvania's policy of hiring only female guards to supervise female inmates. The issue before the Third Circuit in that case, however, was whether the district court properly applied res judicata to the guards' federal action after they had litigated the claim in state court.

These cases serve as examples of the wide variety of approaches taken by courts in resolving conflicts between corrections officers' rights and prisoner rights at the time the instant actions were filed. They further convince this Court that any claimed unlawfulness of the DOC policy was not apparent at the time it was instituted. *See Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. Accordingly, the defendants are entitled to qualified immunity against the Allen plaintiffs' claims for damages.

■ The same result applies as to the Csizmadia and Allen plaintiffs' claims for damages. All the cases cited above in reference to the prisoners' rights mandate that the officers' employment interests be balanced against the rights of the prisoners. As the above cases indicate, there is no clearly established method for balancing these competing interests, and certainly no clearly dictated result. Whereas some cases suggest that prison officials be precluded categorically from opposite-sex housing units, *see, e.g., Goodlander*, 494 F.Supp. at 893–94, other cases require accommodation between prisoners' and officers' rights, *see, e.g., Grummett*, 779 F.2d at 494; *Johnson*, 661 F.Supp. at 430; *Forts*, 471 F.Supp. at 1098. At least one court has even found that the officers' employment rights trump any purported privacy rights held by prisoners. *See Griffin v. Michigan Dept. of Corrections*, 654 F.Supp. 690, 703 (E.D.Mich.1982). The disparate and contradictory results in these cases demonstrate that at no time during this litigation was any claimed unlawfulness of the DOC policy apparent.[10] Accordingly, the defendants are entitled to qualified immunity as to all damages claims.

### 4. Summary Judgment

All parties assert that summary judgment is appropriate based on the undisput-ed facts of record. At oral argument, however, the Court indicated several areas in which material facts appeared to be disputed, and asked the parties to enter into joint stipulation of facts. Although the parties have complied by submitting a twelve page stipulation, material facts still appear to be in dispute, thereby rendering summary judgment inappropriate.

■ In so finding, the Court starts from the now well-established premise that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). Nevertheless, a prisoner's constitutional rights are limited by the fact of incarceration and by valid penological objectives, which include deterrence of crime, rehabilitation of prisoners, and institutional security. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). Inmates, for example, retain certain protections afforded by the First Amendment, including the right to free exercise of religion, *see Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam). Inmates do not, however, retain any Fourth Amendment privacy rights in their cells. *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). To ensure that courts give proper deference to prison officials, the Supreme Court has mandated that prison regulations which purportedly infringe prisoners' constitutional rights be judged under a "reasonableness" standard, as opposed to more stringent tests ordinarily applied to alleged violations of constitutional rights. *O'Lone*, 482 U.S. at 349–50, 107 S.Ct. at 2404–05.

■ The Allen plaintiffs assert that the recent DOC policy violates their right to

---

**10.** Although the parties have not raised it, one might argue that the Court should distinguish for qualified immunity purposes between the assignment policy in effect at the time the Csizmadia and Hundley plaintiffs filed their action and the policy the DOC adopted on September 1, 1989. Such a distinction, however, would not change the result. As the above cases indicate, the unlawfulness of categorical exclusion of officers from certain posts involving routine observation of opposite-sex inmates either naked or in states of undress was not, and indeed still is not, clearly established.

privacy. The constitutional source for this right of privacy, however, remains unclear.[11] The Court need not resolve this issue for the purposes of summary judgment, however, for even assuming that the prisoners have a right to shield their naked bodies from repeated and regular observation by officers of the opposite sex, the reasonableness of the DOC's policy is a fact-specific issue that may not be properly assessed until after full fact-finding has taken place.

Based on the record now before the Court, there is an issue of material fact raised in the affidavits of plaintiff Allen and defendant Rafferty. Allen avers that he has received as many as fifty complaints per weeks arising out of female officers viewing male inmates naked or in states of undress, whereas Rafferty avers that, since implementation of the September 1, 1989 policy, no prisoner complaints have been received through the DOC Ombudsman's Office. The Allen and Rafferty affidavits also contradict each other as to whether the September 1 policy has caused an increase in inmate tensions in the prison. The frequency of such viewings, as well as the effect of such viewings on the orderly running and security of the prison, are highly relevant issues, both as to the reasonableness of the policy and whether such intrusions are sufficiently frequent so as to violate the prisoners' rights.

Moreover, the Court has before it conflicting expert opinions. R.D. Brewer, defendants' expert, concludes that introducing opposite-sex corrections officers to all assignments within the prison jeopardizes prison security, and, in some instances, the safety of the corrections officers themselves. George Sumner, expert on behalf of the Csizmadia and Hundley plaintiffs, opines that sex discrimination in work assignments within the DOC is wholly unfounded, and that prison security would be enhanced by the introduction of opposite-sex officers on housing wings, as female officers have "a positive and ameliorative effect upon inmates." Aff. of George Sumner at ¶ 8 (Nov. 20, 1989). In light of this conflicting testimony, the Court is precluded from granting summary judgment in the prisoners' or the defendants' favor on this issue of privacy rights.

The Allen plaintiffs also assert that exposure of their naked bodies to female officers violates the religious beliefs of Muslim and certain Christian inmates. The Muslim plaintiffs [12] complain that the sura (chapter) 24 of the Koran forbids an individual from making a "brazen stare" at another individual, and that it further prohibits individuals from exposing their naked bodies to strangers. The Christian plaintiffs [13] contend that being viewed naked by female officers is an affront to their sense of moral decency, and is violative of their Christian code of ethics. Summary judgment is inappropriate on these claims for the reasons set forth above. Moreover, although the Muslim and Christian inmates appear to hold beliefs that are "religious in nature," the Court must further satisfy itself that the beliefs of these inmates are sincerely held. *See Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025 (3d Cir.1981), *cert. denied*, 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982). At

---

**11.** Prior decisions conflict as to whether the prisoners' rights derive from the Fourth Amendment's prohibition of unreasonable searches and seizures, *see, e.g., Johnson*, 661 F.Supp. at 430; *Chrans*, 629 F.Supp. at 611, the Eighth Amendment's protection from cruel and unusual punishments, *see, e.g., Chrans*, 629 F.Supp. at 611, or is a penumbral right under the Fourteenth Amendment, *see, e.g., Forts*, 471 F.Supp. at 1097 & n. 4. The Ninth Circuit has held that prisoners' privacy rights may derive from both the Fourteenth Amendment, *see York v. Story*, 324 F.2d 450 (9th Cir.1963), *cert. denied*, 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964), and the Fourth Amendment, *see Grummett*, 779 F.2d at 495. Still other courts faced with this

issue have spoken generally in terms of privacy, without identifying the source of the right. *See, e.g., Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079, 1086 (8th Cir.), *cert. denied*, 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980); *Griffin*, 654 F.Supp. 690, 703 (E.D.Mich.1982), *Goodlander*, 494 F.Supp. at 892–93; *Avery*, 473 F.Supp. at 91–92.

**12.** These plaintiffs are Abdul Wasi, Luqman Ali, S. Ali Muslim, and Rasool Shabazz.

**13.** These plaintiffs are S. Anthony Shane, Hampton Jenks, Peter Foster, Neil Murray, Lawrence Fusco, and Wilson Maymi.

492

present, there is no evidence of record from which the Court may make such findings.

■■■ The Court next considers summary judgment regarding the Csizmadia and Hundley plaintiffs' claims of employment discrimination. It is undisputed that the DOC policy expressly discriminates against correction officers of the opposite sex from the inmates they guard. The issue at hand is whether such discrimination is permissible under the bona-fide-occupational qualification ("bfoq") exception of § 703(e) of Title VII, 42 U.S.C. § 2000e–2(e). The bfoq exception is to be narrowly construed. *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977). To qualify as a bfoq, the restriction based on gender must be "reasonably necessary to the normal operation of that particular business." 42 U.S.C. § 2000e–2(e). It is impermissible, however, to refuse to hire an individual on the basis of "stereotyped characterizations of the sexes." *Dothard*, 433 U.S. at 333, 97 S.Ct. at 2729. Rather, an employer may establish gender discrimination as a bfoq only if it can prove that "the essence of the business operation would be undermined by not hiring members of one sex exclusively." *Diaz v. Pan American World Airways*, 442 F.2d 385, 388 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971); *accord, Dothard*, 433 U.S. at 332–37, 97 S.Ct. at 2728–31.

In *Dothard*, the Supreme Court considered whether, *inter alia*, express gender restrictions for corrections officer positions in the Alabama state prison system constituted a bfoq. In finding that such gender restrictions were a bfoq,[14] the Court considered not only whether the officers were physically capable of performing the job, but the possible impact that assignment of female officers would have on prison security, and the potential risk to female officers' safety. *Dothard*, 433 U.S. at 335–36, 97 S.Ct. at 2729–30.

It is undisputed that female corrections officers in the New Jersey DOC are physically, mentally, and emotionally capable of performing housing unit duties. Under *Dothard*, however, this Court also is obligated to consider the potential impact of removing gender restrictions on prison security, prisoners' privacy rights, and the safety of opposite-sex officers assigned to the housing posts. As noted above, the affidavits of Rafferty and Allen, as well as the conflicting expert opinions create genuine issues as to the potential impact on prison security and prisoners' privacy rights. The Court has before it insufficient evidence to determine whether such assignments may create undue risks to officer safety.

Finally, the extent of the DOC policy's purported adverse impact upon the employment rights of the corrections officers is not clear. The parties have diligently prepared and presented data concerning the number of employees in each prison, the number of female employees, the number of assignments per shift and the number of gender restricted assignments per shift. This data, however, does not address the vital questions of how many housing unit assignments opposite-sex officers are precluded from, and whether such restrictions actually limit their opportunities to derive the benefits of receiving housing unit assignments. The Court notes, for instance, that in most of the prisons, each shift has a number of gender-neutral positions sufficient to assign all the opposite-sex officers that work at the prison. Yet, the evidence of record does not indicate how many of these restricted positions are housing unit assignments. The evidence also does not reveal whether all housing unit assignments on each shift were gender-restricted, or whether, despite some restrictions, opposite-sex officers have no practical difficulty in receiving housing unit assignments. Moreover, it is unclear whether assignments to gender-restricted, single-officer

**14.** In so holding, the Supreme Court limited its findings to the specific facts of the case, noting that the Alabama prison system was characterized by "rampant violence" and a "jungle-like atmosphere." *Id.* at 334, 97 S.Ct. at 2729. Be-

cause summary judgment is inappropriate for other reasons, this Court expresses no opinion as to whether *Dothard* is factually distinguishable on this basis.

housing units are materially different than assignments to dual or multiple-officer housing units for the purposes of promotional advancement, higher pay, work shift availability, or vacation time. These unresolved issues of fact require the Court to deny summary judgment.

It is ORDERED this 17th day of September, 1990, that all claims against the New Jersey Department of Corrections arising under 42 U.S.C. §§ 1983, 1985, and 1988 and under the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1 *et seq.*, be and are hereby dismissed; and it is

FURTHER ORDERED that all claims for compensatory and punitive damages against all defendants be and are hereby dismissed; and it is

FURTHER ORDERED that all remaining motions for summary judgment or dismissal be and are hereby denied.